Dana M. Herberholz, ISB No. 7440
Christopher Cuneo, ISB No. 8557
Jordan L. Stott, ISB No. 9820
Alexandra L. Hodson, ISB No. 10631
PARSONS BEHLE & LATIMER
800 W. Main Street, Suite 1300
Boise, ID  83702
Telephone: (208) 562-4900
Facsimile:  (208) 562-4901
Email: DHerberholz@parsonsbehle.com
          CCuneo@parsonsbehle.com
          JStott@parsonsbehle.com
          AHodson@parsonsbehle.com

Attorneys for PLC Trenching Co., LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| PLC TRENCHING CO., LLC,<br><br>               Plaintiff,<br><br>v.<br><br>IM SERVICES GROUP, LLC,<br><br>             Defendant. | Case No. _____<br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff PLC Trenching Co., LLC ("Plaintiff" or "PLC-T"), by and through its undersigned counsel of record, brings this action against Defendant IM Services Group, LLC ("Defendant" or "IMSG"), alleging as follows:

## NATURE OF THE ACTION

1.        This is an action arising under the United States Patent Laws, 35 U.S.C. §§ 1, *et seq*., including 35 U.S.C. § 271.  PLC-T brings this action to stop IMSG from its wrongful use of PLC-T's industry-leading and patented technology for installing underground utilities.

## PARTIES

2.        PLC-T is a New York limited liability company having a principal place of business in Clinton, New York.

3.        On information and belief, IMSG is a Georgia limited liability company having a principal place of business in Boise, Idaho.

## JURISDICTION AND VENUE

4.        This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.        IMSG is subject to this Court's general and specific personal jurisdiction, pursuant to due process and/or the Idaho Long Arm Statute, due at least to its substantial business in this forum, including that IMSG's principal place of business is within this forum and that it has purposely availed itself of the privilege of conducting business in this forum in a continuous and systemic manner.

6.        Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

## FACTS GIVING RISE TO THIS ACTION

### *PLC-T's Patented Encasement Devices*

7.        PLC-T is a family owned, privately held company that provides full-service underground utility installation using cutting-edge equipment and technology.  Founded in 1998,

PLC-T is widely recognized as one of the nation's leading installers of underground collection systems for commercial wind and solar markets in which it has been working since 2002.  Since it began doing business, PLC-T has installed over 25,000,000 linear feet of underground utilities in the U.S. and Canada.

8.      PLC-T's primary customers are large, commercial-scale Engineering Procurement and Construction ("EPC") contractors and electrical contractors who are engaged, among other things, in the erection of large-scale power plants using wind turbines and solar panels to generate electricity at facilities known as "wind farms" and "solar farms."  As natural sources of energy are employed in generating electricity, the business sector is generally known as the "renewable energy industry."

9.      Once electricity is generated by these facilities, it is routed to an on-site electrical substation via a network of medium-voltage underground cables known as the "collection system."  The collection system is an essential component of wind and solar farms.

10.     The market for collection system work is relatively small, with less than a dozen installers, each competing to work on a few (or more) of the approximately thirty (30) subcontracts awarded annually.  Bidding for such work is by invitation only.  A prospective subcontractor is invited to bid for such work only by demonstrating it has the required business experience, financial integrity, and assets necessary to complete the work in accordance with project specifications.  The work is complex and laborious and normally performed under exacting time restrictions, where liquidated damages may be imposed if completion deadlines are not met.

11.     As an innovator of novel installation technologies in the renewable energy industry, PLC-T has invested and continues to invest significant resources in developing

technologies and protecting its proprietary intellectual property, which together give it competitive business advantages.  Because of the unquantifiable value of its technologies and proprietary intellectual property, as well as invaluable customer relationships it has forged in the renewal energy industry for almost 20 years, PLC-T routinely employs confidentiality agreements and other means, including legal action, to ensure that its technologies and intellectual property are not used by others.  For the same reasons, PLC-T does not license its patents for use by others, instead choosing to actively use them for the financial and competitive advantages that they provide, all of which is not financially quantifiable.

12.     To take maximum advantage of its technologies and proprietary intellectual property, PLC-T employs industrial-grade trenching machines to excavate a trench and then install collection system cabling, burying the cables several feet deep in a prescribed configuration, in a manner known as a "single-pass"[1] system.  A "single-pass" system is an installation procedure that PLC-T first pioneered in U.S. wind and solar farm construction and for which PLC-T is generally known.  Photographs of PLC-T's trenching operation with its proprietary technology are shown below:



*Photog. 1 – PLC-T trenching vehicle*

---

[1] The "single-pass" is also known in the industry as the "one-pass" system.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 4**
29871.001



*Photog. 2 – PLC-T trenching vehicle in operation*

13.     Fine material with the requisite thermal properties, whether processed from on-site native material or imported to the jobsite, must be used to encase the utilities in the collection system.  The fine material provides protection for the cable, where larger particulates could easily damage it during installation or as the result of the natural shifting of the ground following installation and burial.  Fine material is, therefore, invariably required by the EPC contractor's project specifications.

14.     After PLC-T began working on renewal energy projects, its Supervisor for Technical Operations, Michael Lopata, conceived and developed a system for laying and encasing utilities within a trench using excavated trench material that is processed into fine material during the installation operation.  This novel system included a plow that sweeps excavated material back into the trench and onto a screening member that processes the excavated material and then deposits it onto the placed utility in a specific manner that properly encases the utility in accordance with prescribed specifications.  This encasement system for protecting the utilities is facilitated by PLC-T's "Encasement Devices" (also referred to in

company literature as a "Screening Laying Box system").  PLC-T's encasement system is far

superior to traditional utility installation methods, which are comparatively less productive and

more burdensome and costly to undertake.

15.     PLC-T's customers benefit from PLC-T's encasement system because it enables

PLC-T to install underground utilities at greater speeds and without the need to import select or

processed fill, thereby reducing the time and costs associated with traditional trenching and

utility installations.

### *PLC-T's Patents*

16.     The United States Patent and Trademark Office has awarded several patents to

PLC-T for its innovation.  These patents include U.S. Patent No. 6,981,342 titled "Screening

Laying Box" ("the '342 Patent"), attached as **Exhibit A**, and U.S. Patent No. 7,310,896 titled

"Mechanized Unit for Protectively Encasing a Utility in a Trench With Processed Excavated

Trench Material" ("the '896 Patent"), attached as **Exhibit B** (collectively, the "Patents").  PLC-T

is the assignee of the entire right, title, and interest to the Patents.  PLC-T's trenching operations

include the inventions disclosed and claimed in the '342 Patent and the '896 Patent.  The

Encasement Devices are commercial embodiments of the Patents.

17.     The '342 Patent discloses "[a] mechanized unit that is moved through a trench in

the ground for the purpose of placing a length or lengths of a utility or utilities by a guide device

on the bottom of the trench, and then encasing the placed utility or utilities."  *See* Exh. A,

Abstract.

18.     The '342 Patent further discloses that a "screening member is constructed so that

layers of the excavated material of increasing particle size are deposited over the utility or

utilities.  The layer of smallest particles directly encases the utility or utilities rather than larger

size particles.  This protects the utility or utilities from stresses or direct physical damage that

would be caused by large excavated soil or rock particles.  The mechanized unit of the invention

accomplishes this in one continuous operation together with the laying of the one or more

utilities." *See* Exh. A, Brief Description of the Invention.



*'342 Patent, Fig. 1 and Fig. 2*

19.    The '896 Patent discloses a similar trenching system, including, a "screening unit

[that] has sections of progressively larger openings from front to rear." *See* Exh. B, Abstract.



*'896 Patent, Fig. 1 and Fig. 3*

20.    PLC-T has produced commercial embodiments of the Patents as depicted in part

below:



*Photog. 3 – One Iteration of PLC-T's Encasement Device*



*Photog. 4 – One Iteration of PLC-T's Encasement Device in use*

21.     PLC-T has never licensed the Patents, nor has it made any commercial

embodiments of the Patents available for sale, lease, license, manufacture, or use by others in the

U.S. or anywhere else in the world.  It has always been PLC-T's intention and practice to deploy

the Encasement Devices exclusively for its own uses and purposes, whether performing collection system installations or other work.

22.     The Encasement Devices enable the company to provide exceptionally proficient collection system installations that are distinguished by their precision and speed, and in this way PLC-T separates itself from its competitors who routinely use less efficient and more expensive means to provide the same products and services.

23.     PLC-T uses the Encasement Devices on every collection system installation it undertakes.  PLC-T's formal proposals for collection system work contain, among other things, its bid price and the terms of its engagement, and inform the customer that the company owns patented technologies that are used to accomplish the work.

### *IMSG's Infringement*

24.     Among other services, IMSG recently started performing collection system installations at renewable energy facilities, particularly wind farms and solar farms.  Upon information and belief, IMSG has been engaged in collection system installations for only a short period of time, after purchasing or leasing trenching equipment similar to that owned by PLC-T. IMSG has also marketed itself using the "single-pass" designation to describe its trenching and installation services.

25.     IMSG and PLC-T are direct competitors and, upon information and belief, have offered competing bids for work on the same wind or solar farm projects, each seeking to be awarded the subcontract for the collection system installation.  In most cases, only one subcontract is awarded for the installation of the collection system.

26.     Subcontracts for collection system installations are highly lucrative and therefore much sought after by PLC-T's competitors.

27.     In September 2020, PLC-T was installing a collection system in Oregon on the Wheatridge Renewable Energy Facility II as a subcontractor to an electrical contractor.  The Wheatridge facility required a collection system of approximately 500,000 feet, and the electrical contractor, Rosendin Electric, Inc., had entered into subcontracts with both PLC-T and IMSG to perform work at the project.  PLC-T was contracted to install all but 100,000 linear feet of the collection system, the balance of which was to be installed by IMSG.  Upon completion of its work, PLC-T was requested to assist IMSG in completing its portion of the installation.  At that time, PLC-T discovered that IMSG was using PLC-T's Patents without its knowledge and without PLC-T's approval, in violation of its legal rights.

28.     Photographs taken at the Wheatridge facility during inspection of IMSG's equipment show a screening member mounted to a moveable unit and a plow for sweeping excavated material lying along the side of the trench onto the screening member with openings of varying sizes (an infringing embodiment of the Patents is referred to herein as the "Accused Product").  Photographs of IMSG's equipment taken at the Wheatridge facility are shown below:



*Photog. 5 – IMSG's Trenching Vehicle*

**COMPLAINT AND DEMAND FOR JURY TRIAL - 10**
29871.001



*Photog. 6 – IMSG's Trenching System with Encasement Device*



*Photog. 7 – IMSG's Trenching System with Encasement Device*



*Photog. 8 – IMSG's Trenching System with Encasement Device*

29.     Upon information and belief, Marais, S.A ("Marais"), a French company, manufactured the trenching equipment used by IMSG at the Wheatridge facility.

30.     A promotional video by Marais available at https://www.samarais.com/en/ products/st2-standard-.html shows a trenching system being used in South Africa that screens previously excavated material.  A plow is used for sweeping the excavated material lying along the side of the trench onto a screening member of a laying box, which is clearly an embodiment of PLC-T's Patents.  Screenshots of the promotional video are shown below.  On information and belief, Marais did not start manufacturing and using this technology until after PLC-T had patented and was using the Encasement Devices.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 12**
29871.001





31.     Upon information and belief, IMSG purchased or leased trenching equipment (with the Accused Product) from Marais and/or its affiliate, or from a foreign or domestic purveyor of such products, and/or acquired or made one or more embodiments of PLC-T's Patents in the United States for use with existing equipment.

32.     IMSG's infringement of the Patents has caused irreparable harm to PLC-T's reputation, business, customer relations, and prospects for future revenue.  IMSG has sold and is selling its services to customers of PLC-T.  Upon information and belief, IMSG is bidding and/or obtaining collection system work at lower than the current market prices.

33.     In or about 2020, Blattner Energy, Inc. ("Blattner"), an EPC contractor with whom PLC-T had worked for many years, invited PLC-T to submit bids to install a collection system for the Western Spirit Wind Project in New Mexico ("Western Spirit project"), a large wind farm requiring the installation of 1.4 million feet of trench over a one-year period.  This project represented a revenue opportunity for PLC-T in many millions of dollars.  PLC-T submitted its initial bid for the collection system work at Western Spirit ("New Mexico Contract"), and several other bids followed after Blattner advised PLC-T of changes in the scope of work specifications.

34.     Upon information and belief, Blattner invited IMSG to submit a competing bid for the Western Spirit project.  After receiving IMSG's bid, Blattner informed PLC-T that it was a "finalist" and competing against IMSG for the New Mexico Contract.  At Blattner's request, PLC-T lowered its bid price, but was told that its bid was not "low enough."  Blattner awarded New Mexico Contract to IMSG.

35.     Work on the New Mexico Contract began in November 2020, and IMSG is currently performing work on the Western Spirit project.  On the Internet site "LinkedIn," IMSG has posted information showing it is presently performing services required under the New Mexico Contract, and it is likely that IMSG is using the Accused Product as it did at the Wheatridge facility.

36.     Upon information and belief, IMSG has installed collection systems and other underground utilities at other locations throughout the United States using one or more iterations of the Accused Product.

37.     IMSG can perform the subcontract work without using the Accused Product, yet has chosen to infringe PLC-T's Patents in order to market itself as a company that can provide collection installation services that are virtually indistinguishable from those provided by PLC-T. In addition, by using the Accused Product, IMSG saves considerable time and cost in the performance of its work, which enables it to price its work more competitively and enjoy the likelihood of greater financial success.

38.     PLC-T therefore seeks damages and injunctive relief against IMSG's manufacture, importation, and/or use of the Accused Product and any other IMSG products or systems that infringe any claims of the Patents.

## FIRST CLAIM FOR RELIEF
### Infringement of the '342 Patent

39.     Paragraphs 1-38 are incorporated by reference as if fully set forth herein.

40.     PLC-T is the owner of all rights, title, and interest in the '342 Patent, which issued on January 3, 2006.

41.     The '342 Patent is valid and enforceable.

42.     On information and belief, IMSG's manufacture, importation, and/or use of the Accused Product constitutes infringement of at least one claim of the '342 Patent, either directly or under the doctrine of equivalents.

43.     Independent claim 1 of the '342 Patent is representative and recites:

> A movable unit for screening excavated material to protectively cover or encase one or more utilities in an excavated trench, comprising:

a screening member mounted to the unit and located within the trench above the one or more utilities in the trench;

a plow for sweeping excavated material lying along at least one side of the trench onto said screening member, wherein said screening member has at least one screen with a plurality of openings with the excavated material passing through the openings of said at least one screen to deposit onto the utility or utilities installed in the trench as the unit moves.

44.    The Accused Product is used by IMSG to screen excavated material.

45.    The Accused Product includes a screening member and a plow that are movable as a unit along an excavated trench.

46.    As the moveable unit of the Accused Product is moved along the trench, the screening member is above installed utilities, excavated material lying along the side of the trench is swept onto the screening member, and the material passes through openings of the screening member onto the utilities within the trench.

47.    IMSG is liable for infringement under 35 U.S.C. § 271.

48.    If IMSG's infringing activities are not enjoined, PLC-T will suffer irreparable harm that cannot be adequately compensated by a monetary award.  Further, IMSG will not suffer hardship if it is barred from using the Accused Product, while the public interest will be promoted by enforcing patent rights secured through great financial investment and ingenuity.

49.    PLC-T has also suffered economic harm as a result of IMSG's infringing activities in an amount to be proven at trial.

50.    PLC-T meets the criteria for and is entitled to temporary, preliminary, and permanent injunctive relief.

### SECOND CLAIM FOR RELIEF
### Infringement of the '896 Patent

51.    Paragraphs 1-50 are incorporated by reference as if fully set forth herein.

52.     PLC-T is the owner of all rights, title, and interest in the '896 Patent, which issued on December 25, 2007.

53.     The '896 Patent is valid and enforceable.

54.     On information and belief IMSG's manufacture, importation, and/or use of the Accused Product constitutes infringement of at least one claim of the '896 Patent, either directly or under the doctrine of equivalents.

55.     Independent claim 1 of the '896 Patent is representative and recites:

> A movable unit for screening excavated material to protectively cover or encase one or more utilities in an excavated trench in the ground comprising:
> a screening member of a single layer screen mounted to the unit so as to be located below the ground surface within the trench and above the one or more utilities in the trench, said screening member having a plurality of sections of openings of progressively increasing size relative to the front of the unit;
> a plow for sweeping excavated material lying along at least one side of the excavated trench onto said screening member, wherein the excavated material swept onto said screening member passes through the sections of openings of progressively increasing size to deposit layers of particles of the excavated material of progressively increasing size onto the utility or utilities installed in the trench as the unit moves.

56.     The Accused Product is used by IMSG to screen excavated material.

57.     The Accused Product includes a screening member and a plow that are movable as a unit along an excavated trench.

58.     The screening member of the Accused Product includes a plurality of sections of openings of progressively increasing size.

59.     As the moveable unit of the Accused Product is moved along the trench, the screening member is above installed utilities, excavated material lying along the side of the trench is swept onto the screening member, and the material passes through openings of the

screening member onto the utilities within the trench.  As the material passes through the openings, the material is deposited in layers of particles of progressively increasing size.

60.     IMSG is liable for infringement under 35 U.S.C. § 271.

61.     If IMSG's infringing activities are not enjoined, PLC-T will suffer irreparable harm that cannot be adequately compensated by a monetary award.  Further, IMSG will not suffer hardship if it is barred from using the Accused Product, while the public interest will be promoted by enforcing patent rights secured through great financial investment and ingenuity.

62.     PLC-T has also suffered economic harm as a result of IMSG's infringing activities in an amount to be proven at trial.

63.     PLC-T meets the criteria for and is entitled to temporary, preliminary, and permanent injunctive relief.

## DEMAND FOR JURY TRIAL

PLC-T hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, PLC-T prays for entry of judgment against IMSG, as follows:

1.     That judgment be entered in favor of PLC-T on all claims for relief raised in the Complaint;

2.     That judgment be entered that IMSG has infringed (either literally or under the doctrine of equivalents) the Patents and that the Patents are valid and enforceable;

3.     That judgment be entered that IMSG's infringement is and/or has been willful and increasing the award of damage to PLC-T up to three times in view of IMSG's willful infringement;

4.      That a preliminary and permanent injunction be entered enjoining IMSG, and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement, inducing the infringement of, or contributing to the infringement of the Patents;

5.      That judgment and order be entered requiring IMSG to pay PLC-T its damages, costs, expenses, and prejudgment and post-judgment interest for IMSG's infringement of the Patents as provided under 35 U.S.C. § 284;

6.      That judgment be entered awarding PLC-T for enhanced damages as provided under 35 U.S.C. § 284;

7.      That judgment and order be entered finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to PLC-T its reasonable attorney's fees;

8.      That judgment and order be entered awarding to PLC-T all other relief to which PLC-T may prove itself to be entitled; and

9.      For such other and further relief as the Court deems just and proper.

DATED THIS 31st of December, 2020.

PARSONS BEHLE & LATIMER

By */s/ Dana M. Herberholz*
     Dana M. Herberholz
     Christopher Cuneo
     Jordan L. Stott
     Alexandra L. Hodson
Attorneys for PLC Trenching Co., LLC